20cr128 NEB

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No.

**RECEIVED**
JUN 29 2020
CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL OELRICH,

Defendant.

**INFORMATION**

18 U.S.C. § 1349
18 U.S.C. § 981(a)(1)(C)
28 U.S.C. § 2461(c)

THE UNITED STATES ATTORNEY CHARGES THAT:

### COUNT 1
(Conspiracy to Commit Mail Fraud)

1.  From in or about 2011 through in or about February 2020, in the State and District of Minnesota and elsewhere, the Defendant,

**MICHAEL OELRICH,**

did knowingly conspire with others known and unknown to devise a scheme and artifice to defraud and to obtain money by materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, and attempting to do so, caused the sending, delivering, and receipt of various matters and things by United States Postal Service and private and commercial interstate carrier.

2.  The purpose of the conspiracy was to enrich OELRICH and his co-conspirators through a telemarketing fraud scheme involving magazine subscription sales. OELRICH owned and operated multiple companies involved in fraudulent



magazine sales. OELRICH's companies operated telemarketing call centers in Florida. These companies used fraudulent sales scripts to defraud victim-consumers, many of whom were elderly or otherwise vulnerable, out of hundreds or even thousands of dollars. The fraudulent sales scripts were designed to induce consumers, through a series of lies and misrepresentations, into making large or repeat payments to the companies.

3. As part of the scheme, OELRICH obtained lead lists, or lists of consumers who had active and ongoing magazine subscriptions through other companies. OELRICH knew that these lead lists contained consumers who were elderly or otherwise susceptible to fraudulent and deceptive sales tactics.

4. At OELRICH's direction, his sales employees called consumers on these lead lists. The employees, using lies and misrepresentations, signed consumers up for expensive magazine subscriptions that they did not understand they were signing up for and did not want.

5. Among other misrepresentations used by OELRICH and his employees, they falsely and fraudulently claimed they were calling from the victim-consumer's existing magazine subscription company about an existing magazine subscription. In reality, OELRICH's company often had no relationship with the victim-consumer and was not the victim-consumer's existing magazine company. Instead, OELRICH's company was calling to defraud them. In the course of the scheme, OELRICH and his companies defrauded thousands of victims.

6. OELRICH ran the call centers on behalf of Individual R, a Kansas City businessman involved in fraudulent magazine sales. OELRICH ran the call centers in Florida. These business were set up in OELRICH's name, or in the name of other individuals, in order to insulate Individual R and hide Individual R's involvement in the fraudulent activity. However, Individual R knew about the fraudulent magazine sales and knowingly collected money from victims who had been defrauded. Individual R and his companies also provided sales leads to OELRICH, which he and his employees used to call and defraud victim-consumers.

7. OELRICH and his companies did not charge the victim-consumers directly. Instead, after OELRICH's companies and employees fraudulently induced victim-consumers into making payments, those victim-consumers' credit cards and bank accounts were charged by Individual R's companies. Individual R's companies also handled debt collection for victim-consumers who did not pay or who challenged the resulting credit card charges as fraudulent. Individual R's companies sent collections letters to victim-consumers using the United States Postal Service. In all, Individual R's companies collected more than $100 million from "customers" of OELRICH's companies.

8. After charging the victim-consumers' credit cards and bank accounts, Individual R, through his companies, made monthly payments to OELRICH and his companies. Between 2012 and 2019, Individual R's companies transferred more than $30 million to companies controlled by OELRICH.

All in violation of Title 18, United States Code, Section 1349.

United States v. Michael Oelrich

## **FORFEITURE ALLEGATIONS**

Paragraphs 1 through 8 of this Information are incorporated herein by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

As a result of the offense alleged in Count 1, OELRICH shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the violation of Title 18, United States Code, Section 1349, and, pursuant to 18 U.S.C. § 982(a)(8), any real or personal property used or intended to be used to commit, to facilitate, or to promote the commission of such offense and any property constituting, derived from, or traceable to the gross proceeds that the defendant obtained directly or indirectly as a result of the offense.

The property subject to forfeiture under the sections referenced above includes, but is not limited to, $62,654.31 seized from SunTrust Bank account No. 1000175681187, with account holder Preferred Media Source Inc.

If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b) and Title 28, United States Code, Section 2461(c).

Dated: June 29, 2020

ERICA H. MacDONALD
United States Attorney

BY: JOSEPH H. THOMPSON
HARRY M. JACOBS
MELINDA A. WILLIAMS
Assistant U.S. Attorneys